**EOD**
04/22/2022

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 21-40561** |
| **NEWSTREAM HOTEL PARTNERS –** | § | |
| **LIT LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |

### ORDER GRANTING DEBTOR'S MOTION PURSUANT TO
### SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE AND
### BANKRUPTCY RULES 6004 AND 6006 APPROVING
### THE SALE OF DEBTOR'S ASSETS

Upon consideration of the *Motion Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 Approving the Sale of Debtor's Assets* (the "**Sale Motion**")[1] [Dkt. No. 134], filed by Newstream Hotel Partners – LIT, LLC ("**Newstream LIT**" or the "**Debtor**"), debtor and debtor-in-possession in the above-captioned bankruptcy case; and this Court having determined that the relief requested in the Sale Motion is in the best interest of the Debtor, its estate, its creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefore, including for the reasons stated on the record at the hearing seeking approval of the Sale and Sale Motion (the "**Sale Hearing**"), and based on the evidence:

### IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.     The Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. § 157 and 1334. Venue of this Chapter 11 Case and the Sale in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core

---

[1] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Sale Motion or the APA, as applicable.

proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court has the authority to enter this Order pursuant to 11 U.S.C. §§ 363(b) and (f).

B.      The statutory and legal predicates for the relief requested in the Sale Motion are Sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (as amended, the "**Bankruptcy Code**"), and Rules 2002, 6004, 6006, 9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

C.      The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 16, 2021 (the "**Petition Date**").

D.      The Debtor owns good, sufficient, and marketable title to the Assets, subject to any and all claims, liens, encumbrances, and interests as may otherwise exist (all such claims, liens, encumbrances and interests, the "**Interests**"). Pursuant to all applicable bankruptcy and non-bankruptcy law, the Debtor has the ability and power to transfer title of the Assets.

E.      On February 3, 2022, the Debtor filed its Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for (i) Approval of Bid Procedures for the Sale of the Assets, (ii) Authorization to Use the Asset Purchase Agreement in Connection Therewith, and (iii) to Set Related Auction and Hearing Dates (the "**Bid Procedures Motion**") [Docket No. 126] by which the Debtor sought authority to implement, among other things, certain sale, auction, and notice procedures.

F.      On February 10, 2022, after appropriate notice and hearing, this Court approved certain sale, auction, and notice procedures requested in the Bid Procedures Motion (the "**Bid Procedures**"), and on February 28, 2022, the Court entered its Order Granting Debtor's Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for (i) Approval of Bid Procedures

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of

for the Sale of the Assets and (ii) to Set Related Auction and Hearing Dates (the "**Bid Procedures Order**") [Dkt. No. 142].

G.      On February 10, 2022, the Debtor filed the Sale Motion by which it sought, among other things, an order (a) authorizing a sale of the Assets free and clear of all Interests (other than as set forth in the proposed Asset Purchase Agreement), and (b) the assumption and assignment of executory contracts and unexpired leases and rights thereunder, as more fully set forth in the Sale Motion.

H.      As evidenced by the Certificate of Service [Docket No. 148] filed on March 15, 2022, the Debtor served the Bid Procedures Order by (a) first class United States Mail, postage prepaid, on the parties identified on the Master Service List (who do not receive electronic notice) at the addresses set forth therein; and (b) the Court's electronic transmission facilities upon all parties receiving notice via that method.

I.      As evidenced by the Certificate of Service [Docket No. 148] filed March 15, 2022, the Debtor served the Notice of Sale, Bid Procedures, Auction and Sale Hearing (the "**Auction and Sale Notice**") within three (3) business days from the Court's entry of the Bid Procedures Order the Sale Notice (as defined in the Bid Procedures Order), by (a) first class United States Mail, postage prepaid, on (i) the parties identified in the Master Service List (who do not receive electronic notice) at the addresses set forth therein; (ii) the parties listed on the Creditor Matrix filed in these Cases; (iii) the parties that have filed proofs of claim in these cases at the addresses set forth in the respective proofs of claim; (iv) all parties that have requested notice and/or filed a notice of appearance in this case; (v) each of the entities that signed NDAs, including each of the entities that submitted letters of intent as of the filing of the Motion; (vi)

---

fact to the fullest extent of the law. *See* FED. R. BANKR. P. 7052.

**ORDER GRANTING DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 APPROVING THE SALE OF DEBTOR'S ASSETS – Page 3 of 17**

each of the entities listed as parties or counter-parties on unexpired leases listed on Exhibit A to the Sale Notice; and (vii) counsel for any other Bidder as of that date; and (b) the Court's electronic transmission facilities upon all parties receiving notice via that method.

J.       Due, sufficient, adequate, and appropriate notice of the Sale Motion and Sale of the Assets, in accordance with the terms of the Bid Procedures approved by the Court, was provided to all parties-in-interest in the Bankruptcy Case.

K.       The notice given by the Debtor of the Sale Motion, the Bid Procedures Order, the Bid Procedures, the Sale Hearing, and the sale of the Assets constitutes good and sufficient notice of the relief granted by this Order and no further notice is required. The Court finds that the scope and manner of notice and service to be proper, timely, adequate, and sufficient in accordance with Bankruptcy Code §§ 105(a), 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, 6007, and 9014, and in compliance with the Bid Procedures Order. A reasonable opportunity, fully consistent with due process, to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

L.       As demonstrated by the evidence in support of the Sale Motion, the Debtor has marketed the Assets and conducted the sale process in compliance with the Bid Procedures Order.

M.       Time is of the essence with respect to the Closing of the Sale of the Assets, and to the extent that the relief provided herein is not immediately granted, the Debtor and its estate will suffer immediate and irreparable harm. Accordingly, the waiver of any stay of this Order is appropriate and in the best interest of the Debtor's estate.

N.    Pursuant to the Bid Procedures, the Debtor's secured lender, UC Four Points Little Rock Holder LLC (the "**Lender**") is deemed to be a Qualified Bidder, and prior to the Bid Deadline, Lender and its nominee to acquire title to the assets, UC Little Rock REO, LLC (the "**Buyer**") submitted a Qualified Bid by credit bidding $12,500,000.00 of the amount owed to the Lender.

O.    The Buyer and the Debtor request approval of the sale of the Debtor's Assets pursuant to the Asset Purchase Agreement and all agreements required thereby (collectively, the "**APA**").

P.    Other parties have had a reasonable opportunity to make a higher or otherwise better offer to purchase the Assets, and the Debtor has determined that the Buyer submitted the highest and best offer for the Assets and selected the Buyer as the Successful Bidder. The Debtor's determination that the APA constitutes the highest and best offer for the Assets and the Debtor's selection of the APA as the Successful Bid constitute a valid and sound exercise of the Debtor's business judgment. The Court's approval of the Sale Motion, the APA, and the transaction(s) contemplated therein maximizes the Debtor's recovery for the Assets and thus is in the best interests of the Debtor and its estates, creditors, and all other parties in interest.

Q.    The Debtor has full power and authority to execute the APA and all other documents referenced in or contemplated by the APA or that are necessary or appropriate to effectuate the Sale as contemplated under the APA.

R.    All actions contemplated by the APA have been duly and validly authorized by all necessary action of the Debtor, and the Debtor has the full power and authority to consummate the transactions contemplated by the APA. No further consents or approvals, other than entry of

this Order, are required for the Debtor or Buyer to consummate the transactions contemplated in the APA.

S.      The Debtor and Buyer negotiated, proposed, and entered into the APA without collusion, in good faith, and from arms'-length bargaining positions.

T.      Buyer is not an "insider" or "affiliate" of the Debtor as those terms are defined in Sections 101(31) and 101(2) of the Bankruptcy Code. Neither the Debtor nor Buyer have engaged in any conduct that would cause or permit the APA to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.

U.      Buyer is purchasing the Assets in good faith and is a good faith Buyer within the meaning of Section 363(m) of the Bankruptcy Code. Buyer has at all times proceeded in good faith in connection with all aspects of the Sale. Buyer (i) recognized that the Debtor was free to deal with any other party interested in acquiring the Assets, (ii) complied with the Bid Procedures Order, and (iii) willingly subjected the bid to the competitive Bid Procedures approved in the Bid Procedures Order. Accordingly, Buyer is entitled to all of the protections afforded under Section 363(m) of the Bankruptcy Code, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and Buyer has otherwise proceeded in good faith in all respects in connection with the Sale specifically and in this Bankruptcy Case generally.

V.      The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

W.      The consideration provided by Buyer pursuant to the APA (i) is fair and adequate, (ii) is the highest or otherwise best offer for the Assets, (iii) will provide a greater recovery for

the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under applicable state law. The was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtor under the Bankruptcy Code or under applicable state law. Neither the Debtor nor Buyer has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

X.      Buyer is not a mere continuation of the Debtor or its estate, and there is no continuity of enterprise between Buyer and the Debtor. Buyer is not holding itself out to the public as a continuation of the Debtor. Buyer is not a successor to the Debtor or its estate, and the transactions contemplated by the APA do not amount to a consolidation, merger, or de facto merger of Buyer and the Debtor.

Y.      The Sale outside a plan of reorganization pursuant to the APA is reasonable and appropriate under the circumstances and does not impermissibly dictate the terms of any future plan of reorganization or liquidation that may be filed by the Debtor, individually or collectively, and is not a *sub rosa* plan.

Z.      The Debtor has demonstrated both (a) good, sufficient, and sound business purpose and justification for the sale of the Assets and (b) compelling circumstances for approval of Sale pursuant to Bankruptcy Code §§ 363(b) and (f).

AA.     The Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code, and all of the applicable requirements of such sections have been

complied with in respect of the Sale. In particular, the Debtor may sell the Assets free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Sections 363(f)(l)-(5) of the Bankruptcy Code have been satisfied. Any party with an interest in the Assets who did not object, or who withdrew its objection, to the Sale or the Sale Motion is deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Any party with an Interest in the Assets who did object falls within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and is adequately protected. The Sale, including the transfer of the Assets to Buyer pursuant to the APA will be a legal, valid, and effective transfer of the Assets and will vest Buyer with all of the Debtor's rights, title, and interest in and to the Assets free and clear of all Interests which have, or could have, been asserted by the Debtor or its creditors.

BB.    The Buyer has identified in the APA certain executory contracts it intends to assume, including that certain *Four Points by Sheraton Relicensing Franchise Agreement*, dated August 24, 2018 (the "**Franchise Agreement**") by and between the Debtor and Marriott International, Inc. ("**Marriott**"). Pursuant to the Bid Procedures, the Debtor gave notice to all counter-parties whose executory contracts the Buyer seeks assume of the amounts the Debtor believed to be necessary to assume such executory contracts, and no counter-parties objected to the amounts proposed in the Auction and Sale Notice. Accordingly, the Court finds that the proposed cure amounts in the Auction and Sale Notice are adequate to assume the executory contracts identified in the APA.

CC.    Pursuant to the Franchise Agreement, the Debtor was granted a non-exclusive license to operate the Debtor's hotel located at 925 South University Avenue, Little Rock, AR 72204 (the "**Hotel**") under the Four Points brand, which includes the use of Marriott's

trademarks and other intellectual property. The Franchise Agreement's express terms provide that the Franchise Agreement cannot be assumed and assigned without Marriott's express written consent. Notwithstanding the foregoing, Marriott consents to the assumption and assignment of the Franchise Agreement to the Buyer pursuant to the terms of that certain comfort letter, dated April 24, 2018, between Marriott and UC Funding, LLC (the "**Comfort Letter**") if the following conditions are satisfied: (i) the Lender complies with all conditions and obligations existing under the Comfort Letter; (ii) Marriott is paid a cure amount of $263,000 (the "**Marriott Cure Amount**") by the Debtor at the sale closing relating to prepetition franchise fees and expenses and outside bankruptcy counsel fees; and (iii) the Buyer assumes the unamortized balance of the "Key Money" obligation (as defined in the Franchise Agreement), which amount is $384,249.03 as of March 31, 2022.

DD.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding the provisions of Bankruptcy Rules 6004(h), the stay pursuant to Bankruptcy Rules 6004(h) is hereby waived, and this Order shall be effective and enforceable immediately upon entry. To the extent necessary under Bankruptcy Rule 9014 and Rule 54(d) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that cause exists not to delay implementation of this Order.

**BASED UPON THE FOREGOING FINDINGS AND THE FINDINGS MADE ON THE RECORD AT THE SALE HEARING, GOOD CAUSE EXISTS FOR ENTRY OF THE FOLLOWING ORDER. IT IS THEREFORE ORDERED:**

1.    The Sale Motion is **GRANTED** as set forth herein.

2.      All objections to the Sale Motion and Sale that have not been withdrawn, waived, or settled are hereby **OVERRULED** on the merits, with prejudice, subject to the conditions and protections to certain creditors as expressly provided herein.

3.      All findings of fact and conclusions of law of this Court stated on the record at the Sale Hearing are incorporated herein by reference and made a part hereof.

### Approval of the APA

4.      The APA, as amended and attached hereto as **Exhibit 1,** including all exhibits and schedules thereto, and all of the terms and conditions thereof are hereby approved, and Seller's representatives shall sign the APA (including all agreements required thereby) and deliver same to Buyer, its designees or the Title Company referenced in the APA on the date of the entry of this Order.

5.      Pursuant to Bankruptcy Code §§ 105, 363 and 365, the Debtor is authorized and directed to consummate the Sale, pursuant to and in accordance with the terms and conditions of the APA.

6.      Without the need for any additional Court order, the Debtor, its officers, partners, managers, employees, and agents are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be reasonably requested by Buyer, or otherwise required under the APA.

7.      The consideration to be provided by Buyer for the Assets under the APA constitutes reasonably equivalent, fair value, and fair consideration therefor under the Bankruptcy

Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any

other applicable state, federal or international law.

### Transfer of the Assets

8.     Pursuant to the Bankruptcy Code §§ 105, 363(b), and 363(f), the transfers of the

Assets to Buyer pursuant to the APA shall (a) be valid, legal, binding, and effective transfers, (b)

vest Buyer with all rights, title, and interests in and to the Assets effective as of the time of the

transfers under the APA, and (c) be free and clear, unless otherwise specified in the APA or this

Order, of all Interests, including, without limitation, all mortgages, restrictions, hypothecations,

charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security

interests, conditional sale or other title retention agreements, pledges, liens—including, without

limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory

liens—judgments, demands, encumbrances, rights of first refusal, offsets, contracts, rights or

recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-

ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or

charges of any kind or nature, if any but not limited to, any restriction on the use, voting, transfer,

receipt of income or other exercise of any attributes of ownership, debts arising in any way in

connection with any agreements, acts, or failures to act, of ownership, debts arising in any way in

connection with any agreements, acts, or failures to act, of either of the Debtor or its predecessors

or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims,

obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments,

restrictions, interests and matters of any kind and nature, whether known or unknown, choate or

inchoate, filed or unfiled, schedules or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or

unliquidated, matured or unmatured, material or non-materials, disputed or undisputed, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, and whether imposed by agreement, law, equity or otherwise, with all the same released, terminated and discharged as to the Assets.

9.      Notwithstanding anything to the contrary, nothing in this Sale Order shall be interpreted as authorizing the Debtor to sell any Assets that it does not own.

10.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to sell and transfer the Assets to Buyer in accordance with this Sale Order and the terms of the APA, or otherwise interfere with Buyer's title to or use of enjoyment of the Assets.

11.     Pursuant to the APA and this Order, the transfer and assignment of the Assets shall be effectuated on the terms set forth therein and herein, and shall not be restricted or prohibited, notwithstanding any alleged approval rights, consent rights, preferential purchase rights, rights or purchase, rights of first refusal, rights of first offer, or similar right with respect to the Debtor's transfer, sale, vesting, assumption, and/or assignment of the Assets.

12.     This Order shall be the Court's determination that, on the Closing Date, all Interests in and to the Assets being transferred and conveyed to Buyer as described in the APA shall be deemed to have been unconditionally released, discharged, and terminated from the Assets, and attach to the Proceeds as set forth herein.

13.     On and after the Closing, except as otherwise set forth herein or in the APA, the Debtor shall have no liability or responsibility for any Assets.

**ORDER GRANTING DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 APPROVING THE SALE OF DEBTOR'S ASSETS – Page 12 of 17**

**Assignment Franchise Provisions**

14.     Each of the executory contracts identified in the APA are deemed assumed by the Debtor and assigned to the Buyer pursuant to 11 U.S.C. 365, provided that the Debtor is not assigning the Inn Ventures IVI, LP management agreement to Buyer. Further, the Debtor is authorized to take such additional steps as may be reasonably necessary to further document or effectuate such assignments.

15.     The Closing shall occur on the later to occur of the entry of this Order and April 22, 2022. Marriott's post-petition franchise fees and expenses billed to the Debtor pursuant to the existing Franchise Agreement shall be deemed allowed administrative expense claims against the Debtor's estate and shall be paid at the Closing by the Debtor.  To the extent that there are any post-petition franchise fees and expenses incurred but not invoiced as of the Closing, the Buyer shall pay Marriott those amounts as they become due.   The Buyer shall pay Franchisor's outside counsel costs related to any documentation in connection with the Closing and the entry into a new franchise agreement. No later than April 25, 2022, the Buyer shall sign and deliver to Marriott (i) a termination agreement of the Franchise Agreement and general release of claims against Marriott and its affiliates and (ii)  a new franchise agreement pursuant to the terms of the Comfort Letter. If there is a deficiency in funds available to pay the Marriott Cure Amount or the post-petition franchise fees and expenses invoiced on or before Closing, the Buyer shall be obligated to satisfy such deficiency to Marriott at the Closing.  Except as otherwise set forth herein, nothing herein shall change, amend, waive, or modify the obligations pursuant to the Comfort Letter.

**Additional Provisions**

16.     On the Closing Date, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its interest in the Assets, if any, as such interests may have been recorded or may otherwise exist.

17.     Regardless of whether the Debtor's creditors execute the releases set forth in the above paragraphs, this Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing with respect to the Assets have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local official, and all other persons and entities who may be required by operation of law, the duties of their offices, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

18.     Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording, and approve as necessary, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

19.     To the extent permitted by § 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relation to the operation of the Assets sold, transferred, or conveyed to Buyer on account of the filing or pendency of this Bankruptcy Case or the Closing of the Sale.

**ORDER GRANTING DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 APPROVING THE SALE OF DEBTOR'S ASSETS – Page 14 of 17**

20.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Interests with respect to the Debtor or the Assets shall not have delivered to the Debtor prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Debtor or the Assets or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets and (b) Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Assets of any kind or nature whatsoever.

21.     All entities that presently are in possession of some or all of the Assets hereby are directed to surrender possession of the Assets to Buyer at the Closing Date.

22.     This Court retains exclusive jurisdiction so long as the Debtor's Bankruptcy Case is pending to (i) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects and (ii) determine as a core proceeding (by motion and without necessity for an adversary proceeding if the Court deems appropriate) any proceeding, dispute, or controversy arising out of or related to this Order and the Sale Hearing.

23.     The transactions contemplated by the APA are undertaken by Buyer in good faith, as that term is used in Bankruptcy Code § 363(m). Accordingly, the reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the Sale, unless such authorization is duly stayed. Buyer is a purchaser in good faith

of the Assets and, upon the occurrence of the Closing Date, is entitled to all of the protections afforded by Bankruptcy Code § 363(m).

24.     The consideration to be provided by Buyer for the Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and all other applicable laws of the United States, any state, territory, possession or the District of Columbia, and (b) is fair and reasonable, and the Sale may not be avoided under § 363(n) of the Bankruptcy Code.

25.     Buyer is not a successor to the Debtor or its estate by reason of any theory or law or equity and, except as set forth in the APA, Buyer shall have no liability or responsibility for any liabilities or other obligations of the Debtor arising under or related to the Assets.

26.     Article 6 of the Uniform Commercial Code governing Bulk Sale Transfers and comparable state statutes are not applicable to the Sale.

27.     Nothing contained in any chapter 11 plan confirmed in this Bankruptcy Cases (or any order of this Court confirming such plan) shall conflict with or derogate from the provisions of the APA or terms of this Order, provided that the retention of jurisdiction under this Order following confirmation of such plan shall not be broader than jurisdiction permitted to be retained under an order of confirmation.

28.     The terms and conditions of the APA and this Order shall be binding in all respects and shall inure to the benefit of the Debtor, its respective bankruptcy estate and its creditors and interest holders, successors, and assigns and Buyer, and its respective affiliates, successors and assigns notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

**ORDER GRANTING DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 APPROVING THE SALE OF DEBTOR'S ASSETS – Page 16 of 17**

29.     The APA and the transactions and instruments contemplated hereby shall not be subject to rejection or avoidance by the Debtor, and its respective affiliates, successors, and assigns, or any chapter 7 or chapter 11 trustee of the Debtor and its estate.

30.     The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that such modification, amendment, or supplement shall not have a material adverse effect on the Debtor's bankruptcy estates.

31.     The provisions of this Order are non-severable and mutually dependent. Headings are included in this Order for each of reference only.

32.     In the event of any inconsistency between the terms of this Order and the APA, the terms and provisions of this Order shall control.

33.     Notwithstanding the provisions of Bankruptcy Rules 6004(h), there is no stay pursuant to Bankruptcy Rule 6004(h) and this Order shall be effective and enforceable immediately upon entry.

SIGNED on this the 22nd day of April, 2022.

Signed on 4/22/2022

*Brenda T. Rhoades*                    YM

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

**ORDER GRANTING DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 APPROVING THE SALE OF DEBTOR'S ASSETS – Page 17 of 17**

## **EXHIBIT 1**

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made and entered into as of this ___ day of April, 2022, by and between **UC FOUR POINTS LITTLE ROCK HOLDER, LLC**, a limited liability company of the State of Delaware or its nominees (the "**Buyer**"), on the one hand, and **NEWSTREAM HOTEL PARTNERS-LIT, LLC**, a limited liability company of the State of Delaware, (the "**Seller**" and, together with Buyer, the "**Parties**"), the debtor and debtor-in-possession in the Bankruptcy Case pending in the Bankruptcy Court.

## RECITALS

A.      On April 16, 2021 (the "**Petition Date**"), the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Texas (the "**Bankruptcy Court**"), thereby initiating the case styled: *In re Newstream Hotel Partners—LIT, LLC*, Case No. 21-40561 (the "**Bankruptcy Case**").

B.      Prior to the Petition Date, the Seller entered into that certain Loan Agreement dated August 23, 2018 by and between Seller as "Borrower" and UC Funding, LLC as "Lender" (the "**Loan Agreement**"). In connection with the Loan Agreement, the Seller also executed that certain Promissory Note (the "**Note**"), Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing (the "**Mortgage**"), Assignment of Leases and Rents (the "**AOLR**") and other collateral loan documents (collectively with the Loan Agreement, Note, Mortgage, and AOLR, the "**Loan Documents**"). Pursuant to the Loan Documents, the Seller borrowed $14,000,000.00. The amounts borrowed pursuant to the Loan Documents are secured by liens on substantially all of the Sellers's assets.  On or around August 24, 2018, UC Funding executed an Assignment of Recorded Documents (the "**Assignment**"), which assigned the Note and rights under the Loan Documents to Buyer.

C.      On February 3, 2022, the Seller filed its Motion to Approve Settlement and Compromise Pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "**Settlement Motion**") in the Bankruptcy Case, which sought *inter alia* to approve a settlement between the Seller and Buyer (the "**Settlement**") whereby the Buyer agreed to sell the Assets (as hereinafter defined) pursuant to certain bid procedures. On February 28, 2022, the Bankruptcy Court entered an order (the "**Settlement Approval Order**") that approved the Settlement. The Settlement provides *inter alia* that the Seller will pay to the Buyer, subject to certain conditions, a cash payment equal to $250,000 (the "**Settlement Cash**").

D.      In connection with the Settlement, the Seller filed its Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for (i) Approval of Bid Procedures for the Sale of the Assets, and (ii) to Set Related Auction and Hearing Dates (the "**Bid Procedures Motion**"), which sought to establish certain bid procedures to govern the sale of the Seller's Assets (the "**Bid Procedures**"). On February 28, 2022, the Bankruptcy Court entered an order (the "**Bid Procedures Order**") approving the requested Bid Procedures, which included a provision that allowed and preserved the Buyer's ability to credit bid that amount owed to it pursuant to 11 U.S.C. § 363(k)(the "**Credit Bid Rights**").

E.      Prior to the Bid Deadline (as that term is defined in the Bid Procedures), the Buyer notified the Seller of its intent to exercise its Credit Bid Rights and credit bid $12.5 Million to purchase the Assets.

F.      Buyer wishes to acquire from Seller all of Seller's right, title and interest in and to the following described property (herein collectively referred to as the "**Assets**"):

1.      all those certain lot(s), piece(s) or parcel(s) of land located at 925 South University Avenue, Little Rock, AR 72204, and more particularly described on **Exhibit "A"** attached hereto and incorporated herein by this reference (collectively, the "**Land**"), upon which is located a 263-room, full-service Sheraton hotel known as the "Four Points Hotel by Sheraton" (the "**Hotel**")

2.      all of the structures, parking areas, landscaping, buildings and other improvements situated on the Land (individually and collectively, the "**Improvements**" and together with the Land, the "**Real Property**");

3.      all appliances, fixtures, equipment, machinery, tools, furniture, carpet, drapes, telephones and associated equipment, wifi and associated equipment, security systems and associated equipment; inventory, food and beverages, telephone and/or utility deposits, and other personal property owned by Seller and currently located on or about the Land or Improvements, together with all additions thereto between the date hereof and the date of Closing (individually and collectively, the "**Personal Property**");

4.      all easements benefiting the Real Property;

5.      all rights and appurtenances pertaining to the Land, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way;

6.      Seller's rights and interests in all of the executory contracts, insurance agreements, and unexpired personal property leases set forth on **Exhibit "B"** attached hereto and incorporated herein by this reference (the "**Assigned Contracts**");

7.      Seller's right, title and interest in and to that certain Franchise Agreement, dated August 24, 2018 (as amended, modified, and/or assigned, the "**Franchise Agreement**"), by and between Marriott International, Inc., as franchisor ("**Franchisor**"), and Seller, as franchisee, with respect to the operation of the Hotel;

8.      All warranties and guarantees (the "**Guarantees**") issued to, in favor of, or in the name of, Seller and given in connection with the construction or repair of the Assets or the purchase of any Personal Property to the extent any such Guarantees are assignable and remain outstanding as of the Closing (as hereinafter defined);

9.      All certificates of occupancy (or the local equivalent), permits, licenses (including, without limitation, the liquor license), approvals and authorizations (collectively, "**Permits**"), to the extent such Permits are assignable, issued by any federal, state, county, municipal, governmental or quasi-governmental authority relating to the Real Property and the Hotel;

2

10.     All documents, records and books of accounts relating to the leasing, operation, management and/or maintenance of the Real Property, the Hotel, and the Personal Property, including: physical records; electronically stored data and storage media; personnel and payroll records; computer and all other passwords and security-access codes for access to electronic data and records, computer systems, security systems and password-protected accounts; present and future guest and reservation information; advanced booking information; and records of any future rentals, reservations, meetings, events or conferences to take place in the Hotel, to the extent in Seller's actual or constructive possession (collectively, the "**Books and Records**"); and

11.     All supplies and inventory of any kind, including china, glassware, linens, silverware, kitchen and bar small goods, paper goods, guest supplies, cleaning supplies, operating supplies, printing, stationery and uniforms, whether in use or held in reserve storage for future use in connection with the operation of the Hotel as of the Closing Date ("**Supplies**"); and

G.     In connection with the settlement approved pursuant to the Settlement Order, Seller wishes to sell, assign, transfer and convey to Buyer, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Assets, all at the price, on the other terms and subject to the conditions specified in detail below; and

**NOW, THEREFORE**, in consideration of the foregoing Recitals which are incorporated by reference herein, and the mutual promises herein contained and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged by the Parties hereto, the Parties agree as follows:

1.     Purchase and Sale of Assets.   On the Closing Date (as defined in Section 3.2 hereof), in consideration of the covenants and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Seller shall sell, assign, transfer, convey and deliver to Buyer, free and clear of liens and encumbrances (other than Permitted Liens) to the extent provided in the Approval Order (as defined in Section 8 hereof), all of Seller's right, title and interest in and to the Assets, and Buyer shall purchase from Seller, such right, title and interest in and to the Assets.  For the purposes of this Agreement, the term "**Permitted Liens**" means those certain liens and encumbrances set forth on **Schedule 1.1**.

2.     Consideration.

2.1     Purchase Price.

2.1.1   The consideration to be paid by Buyer to Seller for the Assets shall be Twelve Million Five Hundred Thousand Dollars ($12,500,000.00) coming in the form of a credit against secured obligations owed by Seller to Buyer (the "**Purchase Price**"), subject to downward adjustment for any and all Cure Obligations assumed by Buyer pursuant to Section 2.2.2 hereof and any and all Security Deposits not assumed or assigned to Buyer hereunder.

2.1.2   The Purchase Price shall be credited at Closing simultaneous with the transfer of title to the Assets from Seller to Buyer as set forth herein.

2.2     Assumed Liabilities

3

2.2.1    Effective as of the Closing Date and on the terms set forth in this Agreement, Buyer shall assume the following liabilities (collective, the "Assumed Liabilities"):

(a)    all liabilities and obligations of Seller of any kind or nature whatsoever first arising on and after the Closing Date: (1) in connection with the Buyer's use and ownership of the Assets (including any environmental liabilities, actions, causes of actions, claims and demands whatsoever, incurred under the Environmental Laws (hereinafter defined) associated with, or arising in connection with the Buyer's use and operation of the Assets from and after the Closing Date), (2) under the Assigned Contracts, and (3) with respect to any Advanced Bookings, Advanced Booking Deposits, and safes and baggage, in each case to the extent provided in Article 10 of this Agreement (collectively, the "**Assumed Liabilities**").  "**Environmental Laws**" means all federal, state, and local statutes, regulations, rules, ordinances, decisions, orders or determinations of any judicial body or governmental agency having jurisdiction over the Assets, whenever in effect, which pertain to pollution, contamination or protection of both the indoor and outdoor environment and includes, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 et seq.); the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 et seq.); the Clean Water Act, as amended (33 U.S.C. § 1251 et seq.); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f et seq.); the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 et seq.); the Clean Air Act, as amended (42 U.S.C. § 7401 et seq.); the Occupational Safety and Health Act of 1970, as amended (29 U.S.C. § 651 et seq.); and any analogous, delegated, or related state or local law in the jurisdictions where the Assets are located.

(b)    the unamortized balance of the "Key Money" obligations, as that term is defined in that certain Four Points by Sheraton Relicensing Franchise Agreement, dated August 24, 2018 (the "Marriot Franchise Agreement".

(c)    all liabilities and obligations related to *ad valorem* property and business personalty taxes arising for the years 2021 and 2022 related to the Assets (the "**Unpaid Real Estate Taxes**").  In consideration of Buyer's agreement to assume responsibility for the payment of the Unpaid Real Estate Taxes, Buyer shall be entitled to receive, collect and retain, Seller shall pay over to Buyer to the extent of any Unpaid Real Estate Taxes assumed and/or paid by Buyer, and Seller shall not be entitled to a credit against the Settlement Cash for:

(i)    The cash and cash equivalents at or left by Seller at the Hotel pursuant to Section 10.2.1;

(ii)    any revenue attributable to overnight guests the night before the Closing that had not been closed out;

(iii)    Any credits, refunds, and amounts owed by the Franchisor to the Seller related to the Bonvoy loyalty program, and other credits,

4

refunds and amounts owed to Seller arising or related to the Seller's ownership of the Assets prior to the Closing; and

(iv) any utility or other security deposits, credits or refunds payable to or redeemable by Seller, including any such as are associated with any contracts assumed by Seller and assigned to Buyer.

2.2.2   In connection with the assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code, Seller shall be responsible for paying all amounts that are required to be paid as a condition to Seller's assignment and Buyer's assumption of the Franchise Agreement and Assigned Contracts to Buyer ("**Cure Obligations**").

2.3   <u>Excluded Liabilities</u>.   Notwithstanding any other provision of this Agreement, Buyer shall not assume, succeed to, be liable for, be subject to or be obligated for, nor shall the Assets be subject to, any liabilities that Seller is, or could become, subject to or liable for, other than the Assumed Liabilities (collectively, the "**Excluded Liabilities**") including, without limitation: (i) any liabilities relating to employees or contractors retained by the Seller, its affiliates, contractors or agents in connection with the use and operation of the Assets; (ii) any employment benefit plans of Seller or any of its affiliates; (iii) all liabilities for any taxes of Seller, other than taxes assumed by Buyer pursuant to Section 3.5; and (iv) all liabilities and obligations of any kind or nature whatsoever first arising or existing prior to the Closing Date under the Assigned Contracts.

3.   <u>Closing Transactions</u>.

3.1   <u>Closing Conference</u>.   The Closing of the transactions provided for herein (the "**Closing**") shall take place through either the law offices of Seller's counsel or the offices of Stewart Title Guaranty Company, 10 S. Riverside Plaza, Suite 1450, Chicago, IL 60606 (ATTN: Lisa Sanchez, National Closing Coordinator), a title company authorized to conduct settlement services in Arkansas (as applicable the "**Closing Agent**") or at such other place and in such other manner as the Parties may mutually agree upon in writing.   It is anticipated by the Parties that the Closing shall be conducted pursuant to written closing escrow instructions from the Parties by the delivery to the Closing Agent of documents and funds required to complete and consummate the Closing in accordance with the terms of this Agreement.

3.2   <u>Closing Date</u>.   The Closing shall be held as soon as reasonably practicable following entry of the Approval Order (as defined in Section 8, below) (the "**Closing Date**"); provided that in no event shall the Closing occur later than April 26, 2022 (the "**Outside Date**"), or any later date as agreed to by both Buyer and Seller; provided, however, in the event the conditions to Closing have not been satisfied or waived by the Outside Date, then any Party who is not in default hereunder may terminate this Agreement.   Until this Agreement is either terminated or the Parties have agreed upon an extended Closing Date, the Parties shall use commercially reasonable efforts to continue to work to satisfy all conditions to Closing as soon as possible on or immediately following the entry of the order for sale by the Bankruptcy Court, and the transaction contemplated herein shall close as soon as such conditions are satisfied or waived.

       3.3    <u>Seller's Deliveries to Buyer at Closing</u>.  On the Closing Date, Seller shall make the following deliveries to Buyer:

       3.3.1    A special warranty deed in the form attached hereto as **Exhibit "C"** duly executed and acknowledged by Seller, pursuant to which Seller grants and conveys to Buyer Seller's right, title and interest in and to the Real Property (the "**Deed**").

       3.3.2    A statement under Section 1445 of the Internal Revenue Code in the form attached hereto as **Exhibit "D"**, duly executed and acknowledged by Seller (the "**FIRPTA**").

       3.3.3    A bill of sale transferring, assigning and conveying to Buyer the Tangible Personal Property in the form attached hereto as **Exhibit "E"**, duly executed and acknowledged by Seller (the "**BOS**").

       3.3.4    An assignment and assumption of all of the Bookings and Assigned Contracts in the form attached hereto as **Exhibit "F"**, duly executed and acknowledged by Seller (the "**Lease and Contract Assignment**"), together with delivery to Buyer of any applicable Security Deposits.

       3.3.5    A settlement statement approved and executed by the respective Parties and the Closing Agent reflecting the debits and credits and disbursements to be made by the Closing Agent pursuant to the terms of this Agreement (the "**Closing Statement**").

       3.3.6    Keys and security codes to the locks on any and all doors on the Real Property.

       3.3.7    All of the Sellers's books and records relating to the Hotel in Seller's possession and/or the possession of the Debtor's manager engaged to manage the Hotel.

       3.3.8    Any and all plans and specifications for the Improvements on the Real Property in Seller's possession or the possession of any manager engaged by Seller to manage the Real Property.

       3.3.9    Such notices of the sale to third parties as may be reasonably requested by the Buyer.

       3.3.10  The officer certificate required to be delivered pursuant to Section 4.2.4.

       3.3.11  Such additional documents or items reasonably required, in the jurisdiction where the Real Property is located, to consummate the transactions provided for under this Agreement and to transfer ownership, operations and control of the Real Property and the Hotel to Buyer.

       3.4    <u>Buyer's Deliveries to Seller at Closing</u>.  On the Closing Date, Buyer shall (i) credit for the Purchase Price as required pursuant to Section 2, (ii) cause to be paid and satisfied all such other amounts to be paid by Buyer under the other terms and provisions of this Agreement, (iii) deliver to Seller the Lease and Contract Assignment, duly executed and acknowledged by

Buyer; (iv) a Closing Statement; (v) any officer certificates required to be delivered hereunder; and (vi) execute, if applicable, and deliver to Seller and the Closing Agent such additional documents as may be reasonably requested by Seller or the Closing Agent to consummate the transactions described herein.

3.5     Transfer Taxes; Certain Prorations.

3.5.1   Any taxes, general or special, and all other public or governmental charges or assessments against the Assets which are, or may be, payable on an annual basis (including benefit charges, assessments, liens or encumbrances for sewer, water, drainage or other public improvements, completed or commenced, on or prior to the date hereof, or subsequent thereto), shall be adjusted and apportioned as of the date of Closing, said adjustment apportionment to be on the basis of the fiscal year for which assessed, whether or not such assessments had been levied as of the date of Closing.

3.5.2   Any and all state and local real estate conveyance taxes, "roll back" taxes or similar taxes or any similar charges which may be payable by reason of the sale of the Assets, the recordation of the Deed, and/or the consummation of the transactions contemplated by this Agreement shall be borne and timely paid by Buyer.

3.5.3   All rental income from the Assets shall be adjusted and apportioned as of 12:01 AM on the date of Closing (the "**Proration Date**").

3.5.4   Operating Expenses. Operating Expenses (as hereinafter defined) for the Assets shall be prorated as of the Proration Date. Except with respect to Cure Obligations, which shall be paid in accordance with Section 2.2.2 hereof, Seller shall pay all utility charges and other operating expenses attributable to the Assets, if any (collectively, the "**Operating Expenses**"), incurred prior to, but not including, the Proration Date, and Buyer shall pay all Operating Expenses attributable to the Assets on and after the Proration Date.  To the extent possible, Sellers will endeavor to have the meters for all public utilities (including water) being used on the Assets read on the day of giving possession to Buyer, and Buyer shall arrange with such services and companies to have accounts opened in Buyer's name beginning as of the Proration Date.

3.5.5   Any and all costs, charges and expenses due and payable by Seller with respect to the Franchise Agreement, other than the Cure Obligations, shall be prorated as of the Proration Date, with Seller responsible for all such costs, charges and expenses with respect to the period prior to the Proration Date, and Buyer responsible for all such costs, charges and expenses from and after the Proration Date. Notwithstanding the foregoing, at Closing, Seller shall pay the franchise fees payable pursuant to the Franchise Agreement with respect to the month of April, but shall be subrogated to the franchisor's right to be paid for such fees pursuant to the Settlement and shall be reimbursed by Buyer to the extent of funds available.

3.5.6   As provided in Section 2.2.1 above, any amounts due to the Seller from the Franchisor related to the Bonvoy loyalty program or otherwise shall be paid to and retained by Buyer.

3.5.7   Any and all sales, purchase, transfer, stamp, documentary stamp, recording, use or similar taxes and any similar charges which may be payable by reason of the sale of the Assets, the recordation of the Deed, and/or the consummation of the transactions contemplated by this Agreement shall be borne and timely paid by Buyer.

3.5.8   Any and all other costs, fees or expenses (other than the owner's and lender's title insurance and recording costs) which may be payable by reason of the sale of the Assets, the recordation of the Deed, and/or the consummation of the transactions contemplated by this Agreement shall be borne evenly between Buyer and Seller.

3.5.8   Any and all costs, fees, expenses, and premiums associated with a owner's or lender's title policy to be issued by Closing Agent or any other title insurance company designate by Buyer shall be borne and timely paid by Buyer.

The provisions of this Section 3.5 shall survive the Closing and shall not be merged or extinguished by any settlement, closing, payment of the Purchase Price or by execution and delivery of any deed, bill of sale or assignment.

3.6   _Possession_.   Right to possession of the Assets shall transfer to Buyer immediately on the Closing Date.  Seller shall transfer and deliver to Buyer on the Closing Date such keys and other similar items as Buyer may reasonably require to obtain occupancy and control of the Assets, subject to all leaseholder interests in existence at Closing.

4.   _Conditions Precedent to Closing_.

4.1   _Conditions to Seller's Obligations_.   Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

4.1.1   All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

4.1.2   Buyer shall have delivered, or shall be prepared to deliver to Seller at the Closing, all documents required of Buyer to be delivered at the Closing.

4.1.3

4.1.4   Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.1.5   Buyer shall have delivered to Seller a certificate signed by an authorized officer of Buyer on behalf of Buyer, dated as of the Closing Date, certifying each of the foregoing conditions have been met.

8

4.1.6    The Bankruptcy Court shall have entered the Approval Order, in accordance with Section 8 below, which shall have become a final order and not have been reversed, stayed or modified as of the Closing Date.

4.2    Conditions to Buyer's Obligations.    Buyer's obligation to make the deliveries required of Buyer at the Closing, and to otherwise close the transaction contemplated herein, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1    All representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.2    Seller shall have delivered to Buyer a certificate signed by an authorized officer of Seller on behalf of Seller, dated as of the Closing Date, certifying that the foregoing condition in Section 4.2.1 has been met.

4.2.3    Seller shall have delivered, or shall be prepared to deliver to Buyer at the Closing, all documents required of Seller to be delivered at the Closing.

4.2.4    Seller shall have substantially performed or tendered performance of each and every material covenant on Seller's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.2.5    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 8 below (including, which provides for the assumption and assignment of the Franchise Agreement and Assigned Contracts at Closing), which shall have become a final order and not have been reversed, stayed or modified as of the Closing Date.

4.2.6    Buyer shall have received a commitment for an Owner's Policy of Title Insurance Form (ALTA 2006) from Stewart Title Guaranty Company (the "**Title Company**") in an amount equal to the Purchase Price for the Real Property (the "**Title Policy**") reflecting that Seller is the holder of fee title to the Property and subject to no monetary liens other than real estate taxes and assessments for the years 2019 through 2022 and liens in favor of Buyer.

4.2.7    Seller shall have obtained all consents to the assignment of the Franchise Agreement and the other Assigned Contracts (to the extent third party consent is required to assign the same) to Buyer or its affiliates.

4.2.8    Seller shall have executed any documents required for the transfer to Buyer of all licenses and permits, including the Hotel's liquor license.

4.3    Termination.    If any of the above conditions is neither satisfied nor waived on or before the date by which the condition is required to be satisfied, a Party who is not then in default hereunder may terminate this Agreement by delivering to the other written notice of termination.  In addition, the Agreement can be terminated by the Buyer, if, prior to the Closing Date, the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Bankruptcy Case.  Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving Party; provided,

9

however, that the consent of a Party to the Closing shall constitute a waiver by such Party of any conditions to Closing not satisfied as of the Closing Date.

     5.    <u>Seller's Representations and Warranties</u>.  Seller hereby makes the following representations and warranties to Buyer:

     5.1    <u>Power of Seller</u>. Upon obtaining the Approval Order, Seller will have the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

     5.2    <u>Authorization of Seller</u>.  This Agreement has been duly executed and delivered by Seller, and subject to the Seller's obtaining the Approval Order, the execution and delivery of this Agreement, the consummation of the transaction herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Seller and, assuming due and valid authorization, execution and delivery of this Agreement by Buyer, upon execution and delivery by Seller, this Agreement will constitute a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

     5.3    <u>No Conflicts</u>.  To Seller's knowledge, the execution and delivery of this Agreement and performance by Seller will not (i) conflict with or result in a violation of, or breach of, or constitute a default under, any law or administrative regulation or any of the terms, conditions or provisions of any judgment or decree, which affects the Real Property, or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Seller is a party or by which Seller or its assets or properties may be bound.

     5.4    <u>Violation of Laws</u>.  Seller has not received written notice from any governmental authority alleging that the Real Property is in violation of applicable laws, ordinances or regulations, including applicable Environmental Laws.

     5.5    <u>Foreign Person and OFAC Status</u>.  Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code.  Seller is not a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

     5.6    Intentionally Deleted.

     5.7    <u>Status of Leases and Franchise Agreement</u>.  (i) there are no leases, assignments, subleases, amendments, modifications, agreements or understandings (whether written or oral) with any tenant or occupant of the Real Property or the Hotel other than as expressly identified and set forth herein; and (ii) Since the Petition date, Seller has received no written notice of any default under the Franchise Agreement.

     5.8    <u>Options and Rights of First Refusal</u>.  No party has an option to purchase or right of first refusal with respect to the Real Property.

10

5.9     No Pending Litigation.   To Seller's knowledge, there is no material litigation, proceeding (zoning or otherwise) or governmental investigation pending, or threatened, in writing, against or relating to any Real Property or the transaction contemplated by this Agreement.

5.10    Government-Issued Licenses.   The Seller is and has been at all times in compliance in all material respects with all laws, statutes, codes, ordinances, rules, regulations, treaties, orders and other legal requirements applicable to the Assets.   To Seller's knowledge, (i) all material municipal, county and state licenses and permits issued for the use and operation of the Assets are in full force and effect, and (ii) Seller has received no written notice of any material violation with respect to such licenses and permits that remains uncured or unaddressed.

5.11    Suitability and Adequacy of the Assets.   Subject to Section 11.1, there has been no condemnation, seizure, damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the Assets in any material respect which has not subsequently been completely or is in the process of being completely repaired, replaced or restored.

5.12    Title to Purchased Assets.   The Seller owns the Assets free and clear of all liens and encumbrances (other than Permitted Liens and those liens that will be released at Closing) and, subject to the entry of the Approval Order, at the Closing, Buyer shall be vested with title to such Assets, free and clear of all liens and encumbrances (other than Permitted Liens), to the fullest extent permissible under Law, including section 363(f) of the Bankruptcy Code.

5.13    Environmental Matters.

5.13.1 To the knowledge of Seller, except as could not reasonably be expected to have, individually or in the aggregate, a material adverse effect with respect to Seller: the operations of the Seller at the Real Property are, and have been, in compliance with the provisions of any applicable Environmental Law.

5.13.2 Seller has not received any citations, notices or orders issued or notices of investigations initiated by a governmental authority to or any legal proceedings against a Seller concerning the Real Property, in either case, under any Environmental Laws.

5.13.3 The Seller has provided or made available to Buyer all environmental reports and other environmental documents that are in Seller's possession or control and Seller is not aware of any material matters which are not disclosed in such reports and documents.

5.14    Employees.   There are no on-site employees or persons or entities hired by Seller in connection with the management, operation or maintenance of the Assets, and Seller does not administer, nor does Seller have any obligation, liability or responsibility under, any employee benefit plans.

5.15    Intentionally Deleted.

5.16    Taxes.   Except as otherwise expressly set forth in Section 3.5, (a) all tax returns required to be filed by the Seller with respect to the Assets have been duly and timely filed,

11

or extensions obtained, with the appropriate governmental authorities, (b) all taxes owed by the Seller prior to the date hereof with respect to the Assets that are or have become due have been timely paid in full, or extensions obtained, (d) there are no tax liens on any aspect of the Assets that arose in connection with any failure (or alleged failure) to pay any tax, except for any Permitted Liens, and (d) there is no claim, audit, or examination currently in progress or pending, or to the knowledge of the Seller threatened, by any governmental authority in connection with respect to the Assets.

      5.17   Limitation to Seller's Knowledge.  Any representation or warranty that is made herein that is qualified by the phrase "to Seller's knowledge or similar language shall (i) mean to the extent of the actual knowledge of Seller, as of the date of this Agreement, without any duty of inquiry.

      6.   Buyer's Warranties and Representations.  In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Seller:

      6.1   Limitation to Buyer's Knowledge.  Any representation or warranty that is made herein that is qualified by the phrase "to Buyer's knowledge shall (i) mean to the extent of the actual knowledge of Buyer, as of the date of this Agreement, without any duty of inquiry.

      6.2   Power of Buyer.  Upon obtaining the Approval Order, Buyer shall have all requisite power to execute, deliver and perform this Agreement and all writings relating hereto.

      6.3   Authorization of Buyer.  This Agreement has been duly executed and delivered by Buyer and, upon obtaining the Approval Order, the execution and delivery of this Agreement, the consummation of the transaction herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer and, assuming due and valid authorization, execution and delivery of this Agreement by Seller, upon execution and delivery by Buyer, this Agreement will constitute a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

      6.4   No Conflicts.  To Buyer's knowledge, this Agreement does not and will not: (i) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority applicable to Buyer; or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or their assets or properties may be bound.

      6.5   No Consents Required.  No consent or approval of any third party (including, without limitation any governmental authority) is or was required in connection with Buyer's execution and delivery of this Agreement or its consummation of the transaction contemplated herein.

      6.6   AML, Patriot Act and OFAC.  None of the funds to be used for payment by Buyer of the Purchase Price will be subject to 18 U.S.C. §§ 1956-1957 (Laundering of Money Instruments), 18 U.S.C. §§ 981-986 (Federal Asset Forfeiture), 18 U.S.C. §§ 881 (Drug Property Seizure), Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, or the United and Strengthening America by Providing Appropriate Tools Required to Intercept

and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (the "**USA Patriot Act**"). Buyer is not, and will not become, a person or entity with whom U.S. persons are restricted from doing business with under the regulations of the OFAC (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), the USA Patriot Act, or other governmental action.

6.7   <u>Not an Insider</u>.  Buyer is not an "insider" as such term is defined in Section 101 of the Bankruptcy Code with respect to Seller or any of its affiliate Debtors.

7.   <u>AS-IS</u>.  BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT, <u>EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT</u>, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING, WITHOUT LIMITATION: (i) the quality, nature, adequacy and physical condition of the Assets, including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances, (ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater, (iii) the existence, quality, nature, adequacy and physical condition of utilities serving the Assets, (iv) the development potential of the Assets and the use, habitability, merchantability, or fitness, suitability, value or adequacy of the Assets for any particular purpose, (v) the zoning or other legal status of the Assets or any other public or private restrictions on use of the Assets, (vi) the compliance of the Assets with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity, (vii) the presence of Hazardous Materials on, under or about the Assets or the adjoining or neighboring property, (viii) the quality of any labor and materials used in any structures or other improvements comprising part of the Assets, (ix) the condition of title to the Assets and (x) the economics of the operation of the Assets, including any historical financial or operational information provided by Seller.   In addition, any and all documents, instruments, agreements and other materials, irrespective of the type or medium, provided by Seller or any of its agents, representatives, professional or other third parties to the Buyer with respect to any aspect of the Assets (the "**Materials**") have been  provided without any representation or warranty, express, written, oral, statutory or implied, regarding any aspect of the Materials, including but not limited to the accuracy, completeness, or  the utility thereof and all such representations and warranties are hereby expressly excluded and disclaimed.  Buyer acknowledges that any Materials provided to it by Seller have been provided for informational purposes only and that Seller and its respective, employees, officers, agents, advisors and professionals have not assumed responsibility for independent verification of any of the Materials and have not in fact in any way audited the Materials.  Buyer acknowledges and represents that it (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and inspection (if any) of any documents and other information in entering into this Agreement, and (iii) except as expressly set forth in this Agreement, did not rely upon any written or oral  statements, representations, promises, warranties or guaranties whatsoever, whether

13

express, implied by operation of law, or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures or the sale proposed hereunder.

8.      <u>Bankruptcy Court Approvals</u>.  Seller shall use reasonable, good faith efforts to obtain entry of an order from the Bankruptcy Court in the form and content acceptable to Buyer (and with such other changes as may be reasonably agreed to or requested by either Buyer or Seller, the "**Approval Order**") and Buyer shall cooperate in all reasonable respects in such efforts. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement which the Buyer and Seller may hereafter enter into shall be conditioned upon the Bankruptcy Court's entry of the Approval Order.  If the Bankruptcy Court refuses to issue the Approval Order, then this transaction shall automatically terminate and the Seller and the Buyer shall be relieved of any further liability or obligation hereunder.  Upon entry of the Approval Order in accordance with the provisions of this Section 8 (such entry date being referred to herein as the "**Sale Approval Date**"), the condition set forth in this Section 8 shall conclusively be deemed satisfied.

9.      <u>Covenants</u>.

9.1      <u>Access and Information</u>.  From the date hereof through the Closing Date, Buyer (and its lender) shall be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the Assets and the business and operations related thereto, including the conduct of environmental assessments of the Real Property and title checks, and such examination of the books and records with respect to the Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted upon reasonable advance notice and reasonable business hours. The Seller shall direct and use its commercially reasonable efforts to cause its officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination.  Buyer shall be responsible for, and shall and does hereby indemnify and hold harmless Seller and its agents, employees and representatives from, liability for any loss, cost, expense, claim, injury or actual damage (but not consequential, speculative or other damage) arising from any entry on the Assets by Buyer or its officers, employees, consultants and representatives on the Assets.

9.2      <u>Actions Pending the Closing</u>.  Except (1) as required by applicable Law or by the Bankruptcy Court or (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Buyer, during the period from the date hereof through the Closing Date, the Seller shall:

(a)      Conduct its business and own and operate the Assets in the manner in which it has been operated prior to the date hereof and otherwise in the ordinary course of business;

(b)      Use its commercially reasonable efforts to maintain the existing relations with customers, distributors, suppliers, creditors, business partners, service providers,

employees and others having business dealings in connection with the use and operation of the Assets;

(c)     Maintain all Personal Property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto in the ordinary course of business;

(d)     Pay all undisputed post-petition accounts payable and use commercially reasonable efforts to collect all accounts receivable in the ordinary course of business; and

(e)     Comply with all applicable Laws (including Environmental Laws) with respect to the Assets in all material respects.

9.2.1   <u>Consents and Permits; Non-Assignability</u>.  The Seller shall use its commercially reasonable efforts, and Buyer shall use its commercially reasonable efforts and shall cooperate with the Seller, to obtain at the earliest practicable date all consents and approvals required to assign the Assigned Contracts, Personal Property, and other Assets contemplated by this Agreement.  Buyer and the Seller shall use their commercially reasonable efforts to obtain the issuance or transfer of, all Permits (including Environmental Permits and liquor licenses) required to be issued, transferred or reissued to Buyer in connection with the acquisition of the Assets and the operation of the Real Property by Buyer following the Closing Date.  The Seller shall use its commercially reasonable efforts, and Buyer shall use its commercially reasonable efforts, to give and make all notices and reports that the Seller or Buyer are required to make to the appropriate governmental authority and other Persons with respect to the Permits that may be necessary for the sale of the Assets to Buyer at the Closing.  In the event that the Closing proceeds without the issuance or assignment of any such Assets (it being understood that certain of the foregoing assignments are conditions to Buyer's obligation to close), then following the Closing, the parties shall use commercially reasonable efforts, and cooperate with each other, to promptly obtain such authorizations, approvals, consents or waivers.  Pending such authorization, approval, consent or waiver, the parties shall cooperate with each other in any mutually agreeable, reasonable and lawful arrangements designed to provide to Buyer with the benefits of use of such Assets (including, without limitation, any Environmental Permits and liquor licenses) and to the Seller or its affiliates the benefits, including any indemnities, that they would have obtained had such Assets been conveyed to Buyer at the Closing.  Once authorization, approval, consent or waiver for the sale, assignment, sublease, transfer, conveyance or delivery of any such Assets not sold, assigned, subleased, transferred, conveyed or delivered at the Closing is obtained, the Seller shall assign, transfer, convey and deliver such asset to Buyer at no additional cost.  Notwithstanding the foregoing, Seller shall have no liability to Buyer, and Buyer shall indemnify, defend and hold harmless Seller from any claims, damages, liability, or causes of action arising from Buyer's, or its assigns, operation of the Assets without the assignment of such items.

9.2.2   <u>Intellectual Property; Use of Names</u>.  As of the Closing, the Seller shall promptly discontinue use of and, as applicable, remove from any buildings, signs, vehicles or other asset or property of any Seller other than the Assets, any trademarks, domain names, corporate names, and other intellectual property, together with any variations thereof.

15

9.2.3   Intentionally Omitted.

9.2.4   <u>Insurance</u>.   The Seller shall maintain until Closing all existing insurance policies relating to the Assets in full force and effect at its sole cost and expense.  Such insurance policies shall provide coverage in such amounts as are reasonable and customary for commercial properties similar to the Assets and otherwise sufficient to comply with all material Legal Requirements and all Contracts with respect to the Assets.  Insurance policies or coverage pre-purchased by Seller in connection with the Assets or the Hotel shall be transferred to Buyer, and any unearned premiums associated therewith shall be payable to Buyer; insurance obligations financed by Buyer and owed by Seller to Buyer under prior orders of the Bankruptcy Court shall remain payable and are not waived hereunder.  No notice of cancellation or termination has been received by the Seller with respect to any of such insurance policies.

9.2.5   <u>Confidentiality</u>.  The Seller acknowledges and agrees that from and after the Closing, all non-public information relating to the Assets and the Assumed Liabilities but excluding such non-public information that relates solely to the Excluded Liabilities, shall be valuable and proprietary to Buyer and its affiliates.  The Seller agrees that, from and after the Closing, Seller shall not disclose to any Person any non-public information relating to Buyer and its affiliates, or the Assets and the Assumed Liabilities but excluding such non-public information that relates solely to the Excluded Liabilities, except as required by applicable Law; provided, that the Seller shall give prompt notice to Buyer prior to any such disclosure to the extent permitted by such applicable Law.

9.2.6   <u>Cooperation</u>.  The parties agree to reasonably cooperate with and assist each other with the transfer of the ownership and operations of the Hotel from the Seller to the Buyer, including facilitating the transition of accounts, computers, passwords, keys, access codes, Hotel personnel and employees, and existing guest information.  The Seller agrees to promptly execute any documents necessary to cause or enable the transfer of possession of the Assets and the transition of ownership and control thereof, as well as the ongoing business operations of the Hotel.

10.   <u>Provisions Regarding Hotel</u>.

10.1   <u>General</u>.

10.1.1  As of the date hereof, Seller owns and operates the Hotel.

10.1.2  With respect to the Hotel, Seller shall have the right to continue to make and accept reservations for the rooms, banquet, restaurant, meeting and other facilities (and to accept deposits for and cancellations of such reservations) in the ordinary course of Seller's business, at Seller's customary practices, rates and charges, and Buyer agrees to honor and assume all such reservations following the Closing.

10.2   <u>Prorations Specific to the Hotel</u>.

10.2.1  <u>Room Charges</u>.    Room charges, including mini-bar and entertainment rentals and overnight parking charges, if any, for the night commencing on the Proration Date and ending on the morning of the Closing Date shall be allocated to Buyer. Meal, bar, room service charges, revenues from facsimile, data communications, laundry, vending

16

machine revenue, telephone, internet and other revenue and service charges, and all other revenue actually received from whatever source relating to the Hotel (i) for the period of time prior to the Proration Date shall be the property of Seller, and (ii) for the period of time including and after the Proration Date shall be the property of Buyer. Hotel, restaurant, lounge, and tourist room or occupancy taxes and similar charges imposed by state or local authorities with respect to payments made by guests and other customers of the Hotel for rooms, food and beverage, and other services shall be payable by the party which, pursuant to this Agreement, is entitled to receive the revenues from the rooms, goods or services to which such taxes relate. All cash and cash equivalents on the premises of the Hotel as of the Closing Date, whether in the cash register, safe, donation box or otherwise (which shall equal an amount not less than $6,500 in the aggregate), and all accounts receivable related to the Hotel that have not been collected as of the Closing Date, shall belong to Buyer.

10.2.2 <u>Taxes</u>.  The parties acknowledge that certain other taxes ("**Other Taxes**") accrue and are payable to the various local governments by any business entity operating a hotel and its related facilities.  Included in those Other Taxes may be business and occupation taxes, retail sales taxes, gross receipts taxes, and other special lodging or hotel taxes.  For purposes of this Agreement, all of such Other Taxes (expressly excluding Taxes covered elsewhere in this Agreement) shall be allocated between Seller and Buyer such that those attributable to the period prior to the Proration Date shall be allocable to Seller and those attributable to the period including and after the Proration Date shall be allocable to Buyer (with the attribution of such Other Taxes hereunder to be made in a manner consistent with the attribution under this Agreement of the applicable revenues on which such Other Taxes may be based).  Seller shall be solely responsible for payment of such Other Taxes with respect to the period prior to the Proration Date, and Buyer shall be solely responsible for payment of such taxes with respect to the period including and after the Proration Date.

10.2.3 <u>Remittance</u>. To the extent Buyer or Seller receive payment for any Room charges, including mini-bar and entertainment rentals and overnight parking charges, Meal, bar, room service charges, revenues from facsimile, data communications, laundry, vending machine revenue, telephone, internet and other revenue and service charges, Other Taxes, which are attributable to the other Party, Buyer or Seller, as applicable shall remit such payment to the proper Party, including without limitation, Buyer, Seller, or the applicable taxing authority.

10.3    <u>Unopened Food and Beverage Inventory</u>.  Buyer and Seller acknowledge and agree that the full amount of all Food and Beverage Inventory (as hereinafter defined), owned by Seller and located on or used in connection with the Hotel as of the Proration Date shall be transferred to the Buyer at the Closing Date and is included in the Purchase Price.  As used herein, "**Food and Beverage Inventory**" means any goods (including, without limitation, food and beverages) held for sale at the Hotel.

10.4    <u>Advance Bookings and Deposits</u>.  Buyer agrees to honor and assume all advance bookings or other confirmed reservations for accommodations, public functions, banquets, conferences, meetings, or other uses of any rooms in the Hotel for the period including and after the Closing Date, including agreements with outside booking agents and agreements with entities for corporate rates, as the same may be amended, cancelled or renewed (collectively, the "**Advance Bookings**"), and all room reservation deposits, public function, banquet, conference,

17

meeting, food and beverage deposits and other deposits or fees for Advance Bookings applicable to the period including and after the Closing Date (collectively, the "**Advance Booking Deposits**"). On the Closing Date, the aggregate amount of any Advance Booking Deposits held by or on behalf of Seller applicable to any period from and after the Proration Date shall be paid to Buyer.

10.5   Safes and Baggage.  Seller shall record all contents of any safe located on the Hotel as of 10:00 A.M. on the Closing Date. From and after the Closing Date, the contents of any safe on any of the Hotel which are recorded by the Seller and all items deposited thereafter shall be the responsibility of Buyer.  From and after the Closing Date, Seller shall not be responsible to guests for any baggage stored on the Hotel.

11.   Miscellaneous.

11.1   Damage and Destruction; Condemnation.   Seller shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Assets or condemnation of the Real Property that occurs prior to the Closing Date.

11.1.1  In the event of any damage to or destruction of the Assets or any portion thereof prior to the Closing Date, and Closing subsequently occurs, Buyer shall be entitled to any and all insurance payable in connection with any such losses, damages or destruction, and Seller shall assign any of its rights, titles and interest therein to Buyer.

11.1.2  In the event of the taking of any Real Property, either total or partial, by eminent domain for any public or quasi-public use, or if notice of intent of a taking or a sale in lieu of taking is received by any Seller or Buyer, at or prior to the Closing and Closing subsequently occurs, Buyer shall be entitled to any and all funds payable in connection with any such takings, and Seller shall assign any of its rights, titles and interests in such condemnation or taking to Buyer.

11.2   Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, by overnight delivery by a nationally recognized express courier service or by registered; or certified mail, postage prepaid, return receipt requested; or via confirmed email transmission, and shall be deemed communicated as of the date of receipt.  Mailed notices shall be addressed as set forth below, but each Party may change its address by written notice in accordance with this Section 11.2.  The Parties agree that the attorneys for a Party shall have the authority to deliver notices on such Party's behalf to the other Parties or the Closing Agent.

|  |  |
|---|---|
| To Seller: | **NEWSTREAM HOTEL PARTNERS-LIT, LLC**<br>Attn:  Timothy Nystrom<br>311 South Oak Street, Suite 50<br>Roanoke, Texas 76262<br>Email: tim.nystrom@newstreamcorp.com |
| With a copy to: | Jason Kathman<br>Spencer Fane LLP<br>5700 Granite Parkway, Suite 650 |

18

                                          Plano, TX 75024
                                          Email: jkathman@spencerfane.com


            To Buyer:              **UC FOUR POINTS LITTLE ROCK HOLDER,
                                   LLC**
                                   Attn: Anna Collins
                                   745 Boylston Street, Suite 502
                                   Boston, MA 02116
                                   Email:  acollins@ucfunds.com
                                           josten@ucfunds.com

            With a copy to:        Mark Stromberg
                                   Stromberg Stock, PLLC
                                   8350 North Central Expressway, Suite 1225
                                   Dallas, TX 75206
                                   Email: mark@strombergstock.com


      11.3   Entire Agreement; No Third Party Beneficiaries.  This Agreement and the Exhibits hereto constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof and supersede and cancel all prior agreements, negotiations, correspondence, undertakings, understandings and communications of the Parties, oral and written, with respect to the subject matter hereof, and are not intended to confer upon any person or entity other than the Parties hereto and thereto any rights or remedies hereunder.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

      11.4   Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

      11.5   Closing Date.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

      11.6   Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

      11.7   Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

      11.8   Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party

for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto.

       11.9   <u>Waiver</u>.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

       11.10   <u>Brokerage Obligations</u>. Except for HREC (the "**Broker**"), whom Seller engaged in connection with this transaction following court approval, Seller and the Buyer each represent and warrant to the other that, such Party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby.  It is agreed that other than the fee or commission payable to the Broker (which shall be paid by the Seller to the Broker pursuant to a separate agreement with Broker), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or the Seller in connection with this transaction, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby; provided, however, in no event shall Buyer be obligated to indemnify Seller for any claim by the Broker in connection with this transaction.

       11.11   <u>Payment of Fees and Expenses</u>.  Each Party shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

       11.12   <u>Survival</u>.  Other than with respect to the representations and warranties provided in Section 5, which shall not survive the Closing, the respective representations, warranties, covenants and agreements of Seller and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

       11.13   <u>Assignments</u>.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion; provided, however, Buyer may assign its rights hereunder to an affiliate without Seller's consent but with reasonable prior notice to Seller.

       11.14   <u>Binding Effect</u>.  Subject to the provisions of Section 11.13 above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

       11.15   <u>Applicable Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of Texas, except that the laws of the jurisdiction in which the Assets is located shall govern and apply to the Deed and its legal effect.

11.16   Good Faith.  All Parties hereto agree to use commercially reasonable efforts to take such actions and to execute such documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

11.17   Construction.  In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

11.18   Counterparts.   This Agreement may be signed in counterparts.   The transmission of a signed counterpart of this Agreement by facsimile or by portable document file ("**PDF**") shall have the same force and effect as delivery of an original signed counterpart of this Agreement, and shall constitute valid and effective delivery for all purposes.  Without limiting the generality of the foregoing, transmission by facsimile or PDF shall have the same force and effect as delivery of an original signed counterpart of this Agreement.

11.19   Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

11.20   Bankruptcy Court Jurisdiction.  **THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT.  SUCH COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND SELLER EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.**

11.21   Jury Trial Waiver.   **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.**

11.22   Days.  If any action is required to be performed, or if any notice, consent or other communication is given, on a day that is a Saturday or Sunday or a federal holiday or legal holiday in the State of Texas, such performance shall be deemed to be required, and such notice, consent or other communication shall be deemed to be given, on the first business day following such Saturday, Sunday or legal holiday.  Unless otherwise specified herein, all references herein to a "day" or "days" shall refer to calendar days and not business days.  The term "business day" means any day which is not a Saturday, Sunday, federal holiday or legal holiday in the State of Texas.

11.23   No Recording.   Neither party shall record this Agreement or any memorandum thereof in any public office within the jurisdiction where the Assets are located.

21

11.24   <u>Interpretation and Rules of Construction</u>.  In this Agreement, except to the extent that the context otherwise requires:

11.24.1  when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

11.24.2  the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

11.24.3  whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

11.24.4  the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

11.24.5  all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

11.24.6  the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

11.24.7  any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

11.24.8  references to a person are also to its permitted successors and assigns; and

11.24.9  the use of "or" is not intended to be inclusive unless expressly indicated otherwise.

4880-7196-7517, v. 1

**In Witness Whereof**, Buyer and Seller have executed this Purchase and Sale Agreement as a sealed instrument under Texas law as of the day and year first above written.

**BUYER:**

**UC FOUR POINTS LITTLE ROCK HOLDER, LLC**

By: _____(Seal)

    **Name:** _____

    **Title:** _____

**SELLER:**

**NEWSTREAM HOTEL PARTNERS-LIT, LLC**

By: _____(Seal)

    **Name:** _____

    **Title:** _____

**Exhibit "A"**
**Land Description**

24

4880-7196-7517, v. 1

**Exhibit "B"**
**Leases and Security Deposits**

**Assigned Contracts**

1. Marriott Franchise Agreement

2. Landscape Contract with Aidan Ratliff Exterior Solutions

3. Linen Contract with Alsco, Inc.

4. Pest Elimination Contract with Ecolab

5. Business Center Services Contract with Kharma Consulting

6. Copy Machine Lease with LEAF Capital Funding

7. TV Services Contract with World Cinema, Inc.

8. Uniform Rental Contract with Cintas

9. Security Services Contract with Elite Protection Group

B-1

**Exhibit "C"**
**Deed**

To be provided

D-1

**Exhibit "D"**
**FIRPTA**

**NON-FOREIGN AFFIDAVIT (ENTITY)**

STATE OF---------------           )
                                  ) SS
COUNTY -----------------          )

       Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person (ie. a foreign corporation, foreign partnership, foreign trust or foreign estate.)  To inform the transferee (buyer) that withholding of tax is not required upon the disposition of a U.S. real property interest by_____, the undersigned hereby certifies the following on behalf of _____::

       1.      _____ is not a foreign corporation, foreign partnership, foreign limited liability company, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

       2.      _____'s U.S. employer identification number is _____.

       3.      _____'s office address is _____; and

       4.      _____is not a disregarded entity as defined in §1.1445-2(b)(2)(iii) of the Internal Revenue Code and Income Tax Regulations.

       _____, _____of _____., of _____ understands that this certification may be disclosed to the Internal Revenue Service by transferee (buyer) and that any false statement contained herein could be punished by fine, imprisonment, or both.  The transferee (buyer) is permitted to furnish a copy of this affidavit to the Internal Revenue Service.

       Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of _____.

                     Insert Company Name

                     By:_____(SEAL)
                     Insert Name and Office

       SWORN TO AND SUBSCRIBED before me, the undersigned, a Notary Public for the State and County aforesaid, this _____ day of _____, 2022.

54816/0001-13255481v2

_____(Seal)
Notary Public

E-2

**Exhibit "E"**
**Form of BOS**

**BILL OF SALE**

This Bill of Sale is made effective the _____ day of _____, 20__, by and between _____ ("**Seller**"), and _____ ("**Buyer**"), a _____ .

**WHEREAS**, Seller and Buyer are parties to that certain Purchase and Sale Agreement dated _____, 20__ (the "**Purchase and Sale Agreement**"); and

**WHEREAS**, pursuant to the Purchase and Sale Agreement, Seller has agreed to grant, bargain, sell, assign, transfer, deliver and convey unto Buyer all of Seller's right, title and interest in and to all of the Personal Property, Books and Records, Supplies, and all other Property (each, as defined in the Purchase and Sale Agreement) (collectively, the "**Subject Assets**").

**WHEREAS**, Seller is a debtor in possession in a chapter 11 proceeding before the United States Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"), and the Bankruptcy Court has entered an order authorizing and approving the Purchase and Sale Agreement (the "Sale Order").

**NOW THEREFORE**, Seller hereby grants, bargains, sells, assigns, transfers, deliver and conveys to Buyer all of Seller's right, title and interest in and to all of the Subject Assets.

**TO HAVE AND TO HOLD** the same unto Buyer, its successors and assigns, forever, free, clear and discharged of all former grants, charges, taxes, judgments, mortgages, liens, charges, pledges, hypothocations, and encumbrances of whatsoever name, except for Permitted Liens (as defined in the Purchase and Sale Agreement) and as expressly set forth in the Purchase and Sale Agreement and Sale Order.

BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE SUBJECT ASSETS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT, EXCEPT AS EXPRESSLY SET FORTH IN THE PURCHASE AND SALE AGREEMENT, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE SUBJECT ASSETS, AS SET FORTH IN SECTION 7 OF THE PURCHASE AND SALE AGREEMENT.

This Bill of Sale is delivered pursuant to, and is subject to all of the terms and conditions contained in, the Purchase and Sale Agreement and Sale Order.  In the event of any inconsistency between the provisions of this Bill of Sale and the provisions of the Purchase and Sale Agreement and Sale Order, the provisions of the Purchase and Sale Agreement and Sale Order shall prevail.

F-1

**IN WITNESS WHEREOF**, Seller and Buyer intending to be legally bound hereby, have caused this Bill of Sale to be duly executed under seal the day and year first above written.

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

_____, a _____

_____        By:_____ (Seal)
Witness                                               Name: _____
                                                      Title: _____

                                              _____, a _____

_____        By:_____ (Seal)
Witness                                               Name: _____
                                                      Title: _____

54816/0001-13255481v2
4880-7196-7517, v. 1

<u>Exhibit "F"</u>
<u>Form of Contract and Lease Assignment</u>

## <u>ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS</u>

This Assignment and Assumption of Leases and Contracts (this "Assignment") is made and entered into effective the _____ day of _____ 2022 (the "Effective Date"), by and between _____ ("Assignor") and _____ ("Assignee").

## RECITALS

**WHEREAS**, Assignor is a party to those certain leases and contracts more particularly described on <u>Exhibit A</u>, attached hereto and made a part hereof (individually as "Contract" and collectively the "<u>Contracts</u>"); and

**WHEREAS**, Assignor and Assignee are parties to that certain Purchase and Sale Agreement dated _____, 20__ (the "**Purchase and Sale Agreement**");

**WHEREAS**, Assignor is a debtor in possession in a chapter 11 proceeding before the United States Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court"), and the Bankruptcy Court has entered an order authorizing and approving the Purchase and Sale Agreement (the "**Sale Order**").

**WHEREAS**, in accordance with that certain Purchase and Sale Agreement dated _____, 20___ (the "**Purchase and Sale Agreement**"), by and between Assignor and Assignee, Assignor desires to assign all of Assignor's right, title, interest, duties, liabilities and obligations under each Contract to Assignee, and Assignee desires to accept such assignment and assume all of Assignor's right, title, interest, duties, liabilities and obligations under each Contract, upon the terms and conditions hereinafter set forth.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated by reference herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Assignor and Assignee agree, that, as of the Effective Date, except as expressly set forth in the Purchase and Sale Agreement and Sale Order, (1) Assignor hereby assigns, delegates and transfers unto Assignee all of its right, title, interest, duties, liabilities and obligations in and to, and arising out of, each Contract, and (2) Assignee hereby accepts such assignment, delegation and transfer, and hereby assumes all of Assignor's right, title, interest, duties, liabilities and obligations in and to, and arising out of, each Contract.

This Assignment is delivered pursuant to, and is subject to all of the terms and conditions contained in, the Purchase and Sale Agreement and Sale Order. In the event of any inconsistency between the provisions of this Assignment and the provisions of the Purchase and Sale Agreement and Sale Order, the provisions of the Purchase and Sale Agreement and Sale Order shall prevail.

54816/0001-13255481v2

**IN WITNESS WHEREOF**, Assignor and Assignee have executed and delivered this Assignment, under seal, effective as of the Effective Date.

ASSIGNOR:

_____

By: _____(SEAL)
Name _____
Title: _____

ASSIGNEE:

_____

By: _____(SEAL)
Name _____
Title: _____

54816/0001-13255481v2
4880-7196-7517, v. 1

Exhibit A
List of Leases and Contracts

G-3

**<u>Exhibit "G"</u>**
**<u>Approval Order</u>**

To be provided

H-1

## Schedule 1.1
## Permitted Liens

1.  Rights of tenants in possession, as tenants only, as shown on the rent roll.

2.  Sewer and water use charges which are not yet due and payable.

3.  Liens attributable to ad valorem taxes, real property taxes, personal property taxes, or any similar tax, not yet due and payable.

54816/0001-13255481v2